UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL ACTION NO.   04-10052-GAO


**UNITED STATES OF AMERICA**

**v.**

**JUAN RAMOS
a/k/a "King Faith"**


**MEMORANDUM AND ORDER ON GOVERNMENT'S
MOTION FOR DETENTION**


**MARCH 31, 2004**

**BOWLER, Ch.U.S.M.J.**

On or about February 24, 2004, defendant Juan Ramos (the
"defendant"), a/k/a "King Faith," was arrested pursuant to a two
count Indictment returned in this district on February 19, 2004.
Count One of the Indictment charges the defendant with conspiracy
to distribute cocaine base in violation of Title 21, United
States Code, Section 841(b)(1)(B)(iii), all in violation of Title
21, United States Code, Section 846.  Count Two charges the
defendant with distribution of cocaine base in violation of Title
21, United States Code, Section 841(a)(1) and aiding and abetting
in violation of Title 18, United States Code, Section 2.

The defendant had his initial appearance before the Honorable Charles B. Swartwood on February 24, 2004. He was represented by court appointed counsel. The government moved to detain the defendant on the grounds that there is no condition or combination of conditions that will reasonably assure (1) the safety of any other person and the community (2) the appearance of the defendant and (3) that the defendant will not obstruct justice. 18 U.S.C. §§ 3142 (f)(1)(C), (f)(2)(A) and (f)(2)(B). The government moved for a three day continuance and a detention hearing was scheduled before this court on March 1, 2004.

On that date this court conducted a hearing on the issue of detention. The defendant was represented by court appointed counsel. The government called one witness speaking to the issue of detention. The defendant called one witness. At the conclusion of the hearing, this court took the motion for detention under advisement.

## DISCUSSION

I.   A.   Under the provisions of 18 U.S.C. § 3142(c), "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person." Thus, a defendant must be released under the provisions of 18 U.S.C. § 3142(b) or (c), or be detained pending trial under the provisions of 18 U.S.C. § 3142(e) and after a hearing pursuant to 18 U.S.C.

2

§ 3142(f).  See 18 U.S.C. § 3142(a).

Under 18 U.S.C.§ 3142(e), a defendant may be ordered detained pending trial if the judicial officer finds one of the following three conditions to be true that: (1) by clear and convincing evidence, after a detention hearing under the provisions of § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C.§ 3142(b) or (c)) will reasonably assure the safety of any other person or the community . . .;" (2) by a preponderance of the evidence, after a detention hearing under the provisions of 18 U.S.C. § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or (c)) will reasonably assure the appearance of the person as required . . .;" or (3) there is a serious risk the defendant will flee.[1]  This determination is made by the court at the conclusion of a detention hearing.

B.    The government is entitled to move for detention in a case

---

[1] The distinction between the former and the latter are made clear by the very language of 18 U.S.C. § 3142(f). In the last paragraph of that section, Congress has stated there must be clear and convincing evidence to authorize pretrial detention when the question is whether any condition or combination of conditions "will reasonably assure the safety of any other person and the community . . .." (Latter emphasis added.) By not requiring that same standard vis a vis an assessment of risk of flight, it is clear that a lesser standard--i.e., preponderance of the evidence-- applied. That is precisely the holding in the Second Circuit. See e.g., United States v. Jackson, 823 F.D 4, 5 (D.C.Cir. 1987); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986), cert. dismissed, 107 S.Ct. 562 (1986); see also United States v. Patriarca, 948 F.2d 789, 792 (1st Cir. 1991).

that:

(1)   involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4);[2]

(2)   involves an offense punishable by death or life imprisonment;

(3)   involves an offense prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the maximum authorized punishment is imprisonment for ten years or more;[3] or

(4)   involves any felony alleged to have been committed after the defendant has been convicted of two or more crimes of violence, or of a crime, the punishment for which is death or life imprisonment, or a ten year [or more] offense under the Controlled Substances Act or the Controlled Substances Import and Export Act.

Additionally, the government or the court sua sponte may

---

[2] Section 3156 of Title 18 of the United States Code defines a crime of violence as:
> (A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 3156(a)(4).

[3] The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense--not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines. See United States v. Moss, 887 F.2d 333, 336-7 (1st Cir. 1989).

4

move for, or set, a detention hearing where there is a serious risk of flight, or a serious risk of obstruction of justice or threats to potential witnesses.  See 18 U.S.C. § 3142(f).


C.  In determining whether there are conditions of release which will reasonably assure the appearance of the person and the safety of any other person and the community, this court must take into account:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against the accused;
>
> (3) the history and characteristics of the person, including--
>
>> (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and
>
> (4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

5

D.    The burden of persuasion remains with the government to establish "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  The burden then rests on the defendant to come forward with evidence indicating that these general findings are not applicable to him for whatever reason advanced.  The government must satisfy its position with respect to risk of flight by a preponderance of evidence and with respect to dangerousness by clear and convincing evidence.  <u>See</u> <u>supra</u> footnote 3.  This court must then weigh all relevant factors [set forth under §3142(g)] and determine whether "any condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." The decision is an individualized one based on all relevant factors.  <u>United States v. Patriarca</u>, 948 F.2d 789, 794 ( Cir. 1991); <u>see</u> <u>United States v. Jessup</u>, 757 F.2d 378, 387-88 (1st Cir. 1985).

Moreover, one may be considered a danger to the community even in the absence of a finding by clear and convincing evidence that the accused will engage in <u>physical violence</u>.  Conversely, as noted by the Committee on the Judiciary (Report of the Committee on the Judiciary, United States Senate), on S. 215. 98th Congress, Report No. 98-147 (May 25, 1983):

6

> The concept of defendant's
> dangerousness is described throughout
> this chapter by the term "safety of
> any other person or the community."
> The reference to safety of any other
> person is intended to cover the
> situation in which the safety of a
> particular identifiable individual,
> perhaps a victim or witness, is of
> concern, while the language referring
> to the safety of the community refers
> to the danger <u>that the defendant might
> engage in criminal activity to the
> detriment of the community</u>.  The
> Committee intends that the concern about
> safety be given a broader construction
> than merely danger of harm involving
> physical violence....  The Committee
> also <u>emphasizes</u> that the risk that a
> defendant will <u>continue to engage</u> in
> drug trafficking constitutes a danger to
> the "safety of any other person or the
> community."

<u>Id</u>. (Emphasis added; footnotes omitted); <u>see</u> <u>United States v.
Patriarca</u>, 948 F.2d 789, 792, n.2 (1st Cir. 1991) (danger to
community does not refer only to risk of physical violence); <u>see
also</u> <u>United States v. Tortora</u>, 922 F.2d 880, 884 (1st Cir. 1990)
(stating danger in context of 18 U.S.C. § 3142(g) not meant to
refer only to physical violence); <u>United States v. Hawkins</u>, 617
F.2d 59 (5th Cir.), <u>cert. denied</u>, 449 U.S. 962 (1980)
(trafficking in controlled substances).[4]

The issue critical to determining whether to detain a

---

[4] A defendant may be ordered detained as a danger to the safety of another or to the
community, however, only if the judicial officer determines that a detention hearing is
appropriate under the provisions of moved under 18 U.S.C. § 3142(f)(l), and the judicial officer
has determined that a hearing is appropriate under that latter section.  <u>See</u> <u>United States v. Ploof</u>,
851 F.2d 7 (1st Cir. 1988).

defendant is therefore, whether, with respect to the defendant, based on the guidelines set forth supra in part C of this Order, any condition or combination of conditions of release exist that will reasonably assure the safety of any person and the community; and the presence of the defendant.  18 U.S.C. § 3142(e).


E.   "Where, as here, a defendant is charged with a controlled substance offense punishable by a maximum term of 10 years or more, the government is aided by § 3142(e)'s rebuttable flight presumption."[5]  United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987) (per curiam).  The presumption is not limited to risk of flight.  Rather, the presumption has two components.  One component is that the person poses a risk of flight and the second component is that the person "represents a danger to the community."  United States v. Moss, 887 F.2d 333, 335 n.3 (1st Cir. 1989) (per curiam).

Thus, under section 3142(e) the judicial officer must consider the rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the

---

[5] The presumption reflects Congressional findings that persons who deal in drugs often have the necessary resources and foreign ties to escape to other countries. United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987) (per curiam). Consequently, imposing "a large bond is often ineffective in deterring flight." United States v. Perez-Franco, 839 F.2d 867, 869-70 (1st Cir. 1988).

8

judicial officer finds that there is probable cause to believe that the person has committed an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act or an offense under 18 U.S.C. § 924(c), the use of a firearm to commit a felony.  18 U.S.C. § 3142(e).

The presumption raised as a result of finding probable cause that a defendant committed the relevant narcotics offense is always entitled to evidentiary weight, the amount of which, if at all, depends on the nature of the production by the defendant and the other factors set forth under § 3142(g).  The defendant, however, "bears only the burden of production."  United States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988).  As explained by the United States Court of Appeals with regard to the statutory presumption of section 3142(e):

> Section 3142(e), however, only imposes a burden of production on a defendant.  The burden of persuasion remains with the government.  Nevertheless, even after a defendant has introduced some evidence to rebut the flight presumption, the presumption does not disappear, but retains evidentiary weight--the amount depending on how closely defendant's case resembles the congressional paradigm, Jessup, 757 F.2d at 387--to be considered along with other factors.

United States v. Palmer-Contreras, 835 F.2d at 17-18; see also, United States v. Perez-Franco, 839 F.2d at 869-70.

Finally, it is important to note that the presumption is triggered by the statutory penalty prescribed irrespective of the

9

actual or likely sentence imposed upon the particular defendant. See United States v. Moss, 887 F.2d 333, 337 (1st Cir. 1989) (per curiam). The fact that a defendant may receive a sentence of less than ten years does not make the presumption inapplicable. Id. at 337. Rather, this court may consider such a factor with regard to the weight this court gives to the presumption. Id. At 337.

II.   The defendant, Juan Anthony Ramos, is 23 years of age.  He was born in Methuen.  He was raised and educated in Lawrence and lived briefly in Orlando, FL, during his high school years.

The defendant is the son of Gloria Montijo Ortega and Juan Ramos.  They separated when the defendant was seven years of age and the defendant was raised by his mother.  The defendant's mother resides in Lawrence with Juan Ortega, the defendant's step father.  They have a two year old child.  The defendant also has two step sisters, ages 18 and 22, living in Lawrence.

For the last three years the defendant has lived intermittently between the Lawrence home of his mother and the home of his girlfriend, Mirca Colon ("Ms. Colon"), who resides at 42 Ohio Avenue in Lawrence.  The defendant and Ms. Colon are the parents of two sons.  The children are one and two years of age. In addition, Ms. Colon has a seven year old daughter from a previous relationship.

From February 9, 2004, until the time of his arrest approximately three weeks later, the defendant was employed at the MKS Machine Shop in Lawrence. According to the Pretrial Services report, the defendant was discharged from his position as a result of his arrest. The defendant's prior employment history includes a period of employment with ARC-Write Welding Co. in Lawrence. The defendant was unable to provide the precise dates of his employment but noted that he injured his wrist while he was employed. Last year he received a Workmen's Compensation award of $18,000 as a result of the injury.

In regard to his financial assets the defendant told Pretrial Services that he has spent the money that he recovered as a result of his injury. The defendant and Ms. Colon share two vehicles. The defendant finances a 1997 Volkswagen Passat at a cost of $243 a month and he owns a 1997 mini-van. The defendant reports no other assets and notes liabilities in the amount of $3,500. He is not under a court ordered obligation to pay child support.

The defendant has a prior criminal record. He has prior convictions for a firearms identification violation, resisting arrest and assault and battery on a police officer. His criminal history includes one default and one probation violation.

III. The relevant evidence at the detention hearing showed the

11

following.

The government called Task Force Agent Anthony Turco ("Turco") of the Essex County's Sheriff's Department. He testified that he has been so employed for 12 years and that he is currently assigned to the Federal Bureau of Investigation's ("FBI") Gang Task Force (the "Task Force"), which focuses on gang activity on the North Shore of Massachusetts.

Turco stated that approximately two years ago the Task Force initiated a multi-agency investigation entitled "Operation Dethrone," which targeted illegal activity of the "Latin Kings," a gang operating in the Lawrence area. The investigation was divided into two phases. During the first phase, which focused on gathering intelligence, dozens of people were interviewed, according to Turco. In the second phase cooperating witnesses purchased drugs from targets of the investigations in transactions that were observed by surveillance teams employing audio and video recording equipment.

In further testimony Turco identified a 60 paragraph affidavit authored by FBI Special Agent Mark Karangekis ("Karangekis"), the Task Force coordinator. The affidavit, which was admitted as Government Exhibit # 1, sets forth in detail the background of the investigation, the targets of the investigation and the organization, operations and the leadership of the Latin Kings in Lawrence and Lowell as well as the illegal activities

alleged to be conducted by the Latin Kings.  Attached to the
affidavit is a 42 page document entitled "Massachusetts State
Policy Book." It sets forth practices and procedures followed by
members of the Latin Kings organization.[6]  It describes
procedures for discipline ranging from verbal discipline and
fines to severe beating or death as a punishment for cooperating
with law enforcement.

According to paragraph 50 of the affidavit, during the
course of the investigation the defendant was identified as the
Fourth Regional Officer of the Massachusetts Chapter Crown
Council of the Latin Kings and former leader of the Lawrence
chapter of the Latin Kings.

Turco testified that the defendant emerged during the first
phase of the investigation and that he was known by the street
name of "King Faith."  Turco testified that he was familiar with
the defendant and that he had arrested him in the past.  Turco
identified the defendant in open court.

In further testimony Turco stated that during the first
phase of the investigation the defendant was identified as a
significant member of the Latin Kings hierarchy, specifically
that he held the position of "supreme regional officer."  Turco
explained that during the second phase of the investigation crack

---

[6] The document was seized from an apartment in Lawrence in 2001, according to the
Karangekis affidavit.

cocaine was purchased from the defendant.

Turco identified a packet of documents, which was admitted as Government Exhibit #2. The first document is a memo, dated July 20, 1999, between two law enforcement agents regarding the Latin Kings. The document states that the information was received from a confidential informant who has proven credible in the past. According to the informant, the defendant was "blessed" as the new S.R.O. (Supreme Regional Officer) of the Massachusetts Latin Kings. The informant adds the defendant, "although young, is very knowledgeable with the Latin Kings manifesto or by-laws."

Attached to Government Exhibit # 2 are four letters. The first two letters are dated July 19, 1999 and were written by the defendant while he was in prison. In the first letter the defendant states, "Well first of all Chino Blessed (sic) me temp. S.R.O. and he told me to do some things here and on the streets." The letter makes several references to "Kings." The letters are signed "Faith." The third and fourth letters were sent to the defendant.

In further testimony Turco identified a document, which was admitted as Government Exhibit # 3, as a FBI 302 dated December 9, 2002. According to the 302, on December 8, 2002, a cooperating individual was equipped with a body recorder and transmitter in anticipation of attending a meeting of the Latin

Kings in Lawrence. Although the meeting was cancelled, the cooperating individual and "King Venom," who was identified as Angel Rivera in the 302, had a conversation. King Venom stated that he had ordered the termination of an unnamed king because the king had "snitched" on someone. According to the 302, at the same time King Venom also ordered the termination of King Weasel. The 302 states that four cars were filled with unnamed kings who beat the two kings until they no longer moved.

Turco identified a document, which was admitted as Government Exhibit # 4, as a summary of the drug purchase made from the defendant on April 23, 2003, at which time a cooperating witness ("CW") purchased 10.7 grams of crack cocaine from the defendant. Turco testified that the CW called the defendant on the telephone and arranged to purchase crack cocaine from him.

In further testimony Turco identified a cassette tape, which was a admitted as Government Exhibit # 5, setting forth two conversations between the CW and the defendant on March 23, 2003. The tape was played in open court. A summary of the tape was admitted as Government Exhibit # 5A.

During the conversations the defendant stated that he could get the CW "14 grams, all rock." Later the defendant confirmed that "it will be rock, not powder" and that "it will cost no more than 6." During the course of the conversation the defendant and the CW discuss the "cooking" of drugs. The defendant offered the

15

CW the prospect of lower prices in the future if he could buy a quantity of 100 grams.

Turco testified that the deal took place later in the day at a convenience store in Lawrence. The CW gave the defendant $600 and they agreed to meet later at the parking lot of Richdales, a convenience store in Methuen. Turco identified a video cassette, which was admitted as Government Exhibit # 6, with a recording of the transaction. The videotape was played in open court. On the tape it is possible to observe the defendant. Turco added that after the "buy" law enforcement agents met the CW and field tested the material provided by the defendant which tested positive for cocaine. Turco directed the court's attention to the last page of Government Exhibit # 4, which is a laboratory report confirming the presence of 10.7 grams of crack cocaine from the sale.

According to Turco, unbeknownst to what the federal law enforcement agents were doing, the Methuen Police thought they had observed a drug deal. However they were unable to apprehend the defendant and they let the CW go after questioning him. The next night the defendant called the CW and told the CW that he knew he was a rat. The CW then contacted Juan Conce ("Conce"), also known as King Santos, another member of the Latin Kings hierarchy. The CW asked Conce to call the defendant on his behalf.

16

The conversations between the CW and Conce were recorded.
Turco identified an audio cassette of the conversations which was
admitted as Government Exhibit # 7. A summary of the
conversations was admitted as Government Exhibit # 7A. The
cassette was played in open court. At the end of the
conversation Conce told the CW that there wasn't anything he
could do.

In further testimony Turco testified that on May 28, 2003,
the CW received a call from Barbara Arsenault ("Arsenault"), a
member of the Latin Queens. Turco identified a summary of the
telephone conversation which was admitted as Government Exhibit #
8. During the conversation Arsenault advised the CW that the
Latin Kings had a meeting at which the defendant and other
"warriors" were present.

Arsenault went on to say that the defendant described the CW
as a "rat" and ordered the other kings to "stay away" from him.
She added that the defendant granted permission for the Latin
Kings to "blow up" the CW. Arsenault knows this to mean that the
Latin Kings can utilize any means necessary to hurt or kill the
CW.

On cross examination it was established that the defendant's
name was heard from the onset of the investigation.

On redirect examination Turco was shown an FBI 302 dated
October 2, 2003, reflecting the contents of an interview with an

17

informant. According to the report, which was admitted as Government Exhibit # 9, King Faith supplies cocaine, crack cocaine and guns to other Latin Kings in Lawrence.

On recross examination it was established that the informant referred to Government Exhibit # 9 is not the CW who participated in the April 23, 2003 drug transaction referred to above.

The defense called Mirca Colon ("Ms. Colon"), who testified that she resides at 42 Ohio Avenue in Lawrence. She stated that she is 23 years old and that she has been employed at Holy Family Hospital in Lawrence for the last seven years as a secretary.

Ms. Colon identified the defendant as her "boyfriend" and stated that although he lives with his mother, he frequently "stays" with her. Ms. Colon testified that she and the defendant have two sons, ages one and two. She added that she has a seven year old daughter from another relationship. Ms. Colon and her children live in a three bedroom apartment. She added that she would be willing to have the defendant live with her on a permanent basis and that she would be amenable to serving as a surety.

In further testimony Ms. Colon stated that the defendant has been on Workmen's Compensation for the past three years and that he recently became employed. She added that he pays for his children.

Ms. Colon stated that she has never had any discussion with

18

the defendant or any other person about the Latin Kings.

On cross examination Ms. Colon acknowledged that the defendant has a tattoo on his chest and that it says "Latin Kings."

IV. The return of the Indictment in the United States District Court for the District of Massachusetts in this case establishes the existence of probable cause that the defendant committed the crimes for which he is charged in the Indictment.

The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(C), (f)(2)(A) and (f)(2)(B). The government must prove by clear and convincing evidence that if released the defendant would pose a serious danger to any person or the community or that he would obstruct justice . In contradistinction, the government must demonstrate only by a preponderance of evidence that the defendant, if released, constitutes a serious risk of flight or failure to appear. The two different standards are used because of the clear language expressed in the last paragraph of 18 U.S.C. § 3142(f) which states "that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." Congress, by not attaching that language to the risk of flight clause, infers that a lower standard of proof is all that is

necessary to establish the government's case.

A. <u>Danger to the Community</u>

This court first addresses the likelihood that the defendant, if released, would be a danger to another person or the community.

The government's case against the defendant is strong.  The defendant sold slightly more ten grams of crack cocaine to a CW.  The conversations reflecting the negotiations leading up to transaction were recorded on audio tape and the transaction itself, in which the defendant is clearly visible, was recorded on video tape.  During the course of the negotiations the defendant made recorded references to his supplier of drugs and the possibility of giving the CW a better price in the future if the transactions involved larger quantities of drugs.  The content of the conversations suggests that this was certainly not the defendant's first foray into selling drugs.

While Ms. Colon's willingness to have the defendant live with her and serve as a surety for him is noted, this court found Ms. Colon to be a less than credible witness.

The defendant did not proffer any credible evidence to detract from the government's assertion that he has committed a serious drug crime involving a narcotic drug and that he is a danger to the community or any person.  This court finds by clear

and convincing evidence that there is no condition or combination of conditions that will assure the safety of any person or the community if the defendant is released.

### B. Risk of Flight

Next, this court turns to risk of flight.

Although the defendant does have one default on his criminal record, he has lived in the community for almost all of his life and this court does not find him to be a risk of flight at this time.

### C. Obstruction of Justice

Next, this court turns to obstruction of justice.

The defendant appears to have leadership role in the Latin Kings, an organization that, according to its Massachusetts State Policy Book, espouses a policy of retaliation against individuals who cooperate with the government. The information provided by Ms. Arsenault regarding the defendant's order to "blow up" the defendant is highly disturbing.

This court notes that the defendant's prior criminal history includes a conviction for a firearm identification violation, resisting arrest and assault and battery on a police officer. This is indicative of the defendant's proclivity for violence and combined with the defendant's order to "blow up" the CW strongly

21

suggest that the defendant presents a serious risk of obstructing justice or threatening, injuring or intimidating a prospective witness, i.e. the CW.

This court finds by clear and convincing evidence that there is no condition or combination of conditions that will assure that the defendant will not obstruct justice if he is released.

## V. Conclusion

The government has satisfied this court by clear and convincing evidence that no condition or combination of conditions of release (set forth under 18 U.S.C.§ 3142(b) or (c)) will reasonably assure the safety of any other person or the community if the defendant is released.  In addition the government has satisfied this court by clear and convincing evidence that there is no condition or combination of conditions that will assure that the defendant will not obstruct justice.

Having evaluated the factors set forth in 18 U.S.C. § 3142(g), this court orders the defendant detained subject to the following conditions:

> (1)  The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

22

(2)   The defendant be afforded reasonable opportunity for private consultation with his counsel; and

(3)   On Order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined shall deliver the defendant to an authorized Deputy U.S. Marshal for the purpose of any appearance in connection with a court proceeding.

*Marianne B. Bowler*

**MARIANNE B. BOWLER**
Chief United States Magistrate Judge