UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

    v.                                                Criminal No. 04-10052 GAO

JUAN RAMOS

DEFENDANT'S MOTION TO TRANSFER HIM FROM
THE STATE PRISON AT CEDAR JUNCTION[1]

Defendant Juan Ramos respectfully seeks an order of this Court to the United States Marshal to transferring him, a pretrial detainee, from the Massachusetts State Prison at Cedar Junction to another facility.

As grounds for this motion, defendant states:

1. The United States Marshal in this District has transferred pretrial detainees that were held in Old Colony Correctional Center (OCC) to the state's prison at MCI Cedar Junction. Defendant is one of the detainees who was transferred.

2. Cedar Junction is a level six (maximum) security institution. The only other maximum facility in the state is the Souza-Baranowski Correctional Center. A level 6 classification, according to the DOC's website, "reflect[s] the need to provide maximum external and internal control and supervision of inmates primarily through the use of high security parameters and extensive use of internal physical barriers and check points. Inmates accorded this status present serious escape risks or pose serious threats to themselves, to other inmates, to

---

[1] This motion is taken in large part from a motion filed by attorney Charles McGinty to prevent transfer of his client to Walpole, filed on January 28, 2005.

staff, or the orderly running of the institution. Supervision of inmates is direct and constant." Thus, Cedar Junction houses a highly dangerous population, inmates who "pose serious threats to themselves, to other inmates, to staff, or the orderly running of the institution."

3. Cedar Junction also has a well-earned reputation for the harshness and brutality of its guards. Over the past four years, Massachusetts Correctional Legal Services, the state-wide legal services office for inmates, has maintained statistics regarding guard-on-inmate assaults at state and county institutions, as reported to MCLS. Reports of guard violence originating from Cedar Junction are significantly more numerous than those from any other institution. Indeed, reported guard violence at Cedar Junction is tenfold that at OCC.

4. MCLS also has a Rapid Response to Brutality Project, which, based on a human rights watch model, responds to claims of guard brutality by photographing injuries and advocating for medical care for injured prisoners. The project was created in November 2001 specifically in response to the extraordinary number of incidents of brutality reported from Cedar Junction. MCLS expanded the Project to MCI Framingham in 2003 and to Souza Baranowski in 2004. The number of reported incidents from both Framingham and Souza Baranowski has been low (less than 5 in the past 6 months). The number from Cedar Junction, however, has remained high. MCLS has logged over 120 visits to Cedar Junction over the past 3 years, with 6 visits in the past three weeks alone.

5. Additionally, between July 1997 and June 1999, the DOC reported that 4,764 disciplinary hearings were held at Cedar Junction. The DOC reported that none of the hearings resulted in a "not guilty" finding for the inmate. Each claim by guards was affirmed within the institution, suggesting that accusations made by guards against inmates were never seriously

questioned.

    6. The administration at Cedar Junction has little control over guards and their assignments within the institution, and is unable to remove abusive guards without arbitration proceedings. In the recently-released <u>Report of the Governor's Commission on Corrections Reform</u>,[2] issued on June 30, 2004, the Governor's Commission leveled criticism at the DOC for inadequate control over its facilities, finding that "[t]he Department's management does not have sufficient authority and discretion" to control work assignments within its institutions. Under the collective bargaining contract with correction officers, management had "severely limit[ed]" authority "to assign, promote, transfer and remove a correction officer for the good of the Department." Commission Report at 14. In three facilities, including Cedar Junction, guards "bid" (or "job pick") for their unit assignments "which means that officers can bid for the job they want, and jobs are awarded on the basis of seniority." <u>Id</u>. In Cedar Junction alone, guards have the power to "bid" a particular shift and a particular cell block, and then hold it "for life." <u>Id</u>. at 14, n. 47. The report found that "locked-in bids and seniority govern the staffing process, subject only to a small number of superintendent pick positions." <u>Id</u>. at 14. The practical effect, particularly in Cedar Junction, is that the superintendent is

> unable to transfer or remove an officer for the good of the Department without being subject to grievance and arbitration. *These limitations on managerial discretion impact the most fundamental management functions required to effectively staff and operate DOC facilities*.

<u>Id</u>. at 14-15 [emphasis in original]. In particular, the report "found that the corrections officers

---

[2] The Governor's Commission was created in the aftermath of the high profile death of John Geoghan and the ensuing scandal. A copy of the Report is in PDF format at http://www.mass.gov, within the site for the Executive Office of Public Safety.

were not in jobs that best matched their level of training and strengths or their compatibility with a specific population." Id. at 15. This specific criticism, that DOC has not the means to tailor its guard staff to the "specific population", or, more bluntly, to weed out abusive guards from choice work assignments, is fundamental here.

7. As this Court is aware, many of the detainees in this District are held solely on the ground of flight or non-appearance. Some are charged with immigration-related offenses and are held primarily to assure eventual deportation. Others face possible immigration consequences arising from a conviction. Some were initially released, but later revoked, for minor infractions of release conditions, including personal drug use.

8. Once detained, detainees in this district are not classified or evaluated by the marshal to separate them from persons held by reason of their violent record. (Detainees are separated from known enemies or if cooperating.) Thus, detainees with no records of violence are grouped with those who have. If the Marshal's transfer continues to proceed, all will be detained together in an institution that has insufficient control over its guards and staffing, and where guards are not in jobs "that best matched their level of training and strengths or their compatibility with a specific population." Thus, senior guards, notwithstanding their disciplinary problems or reputations for violence or cruelty, can "bid" to handle the relatively soft population offered by the feds within the planned detainee unit. Plainly, trouble will follow.

9. The blocks reserved for federal detainees, along with other blocks which hold sentenced prisoners, are spaced sequentially along a long corridor. Detainees will have contact with sentenced prisoners during moves, in the library and in the Health Services Unit. They will be mixed in general population for religious services. A detainee who is disciplined is likely to

be held, during an investigation which often takes several months, in the infamous Block 10, which is a sentenced prisoner block, and he may face an internal sentence to the equally notorious DDU.  (As this Court is aware, prison fights generally result in all participants being disciplined, even the ones assaulted.  All would be moved to Block 10.)

10.  Mr. Ramos is held under the provisions of 18 U.S.C. § 3142 (i), under which a detention order shall "direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal."  Defendant submits that there are beds available at county facilities which can ensure separation from sentenced prisoners.  He further submits that confinement at Walpole will assure contact with sentenced prisoners, indeed with the worst offenders that the state system can offer.

11.  Mr. Ramos is subject to lockdown at Walpole 23 hours per day.  Furthermore, he has extremely limited telephone access to contact undersigned counsel regarding his case and preparation for trial.

WHEREFORE, this Court should enter an order for a hearing to determine:

1. whether suitable detention facilities (including county facilities currently used by the Marshal in Plymouth, Norfolk and Essex) are available and "practicable" to ensure that detainees are kept apart from persons awaiting or serving sentences, as required by 18 U.S.C. § 3142(i)(2);

2. whether suitable conditions of confinement exist at Walpole for a pretrial detainee, including whether a detainee would be kept separate from convicted prisoners, among other circumstances, on cellblocks, on food lines, in recreation areas, during family visits, during religious services, during counseling, on disciplinary units, during movements within the institution, and under any other circumstances which may pose a risk of harm to a detainee; and

3. whether, consistent with 18 U.S.C. § 3142(i)(3), a detainee at Walpole will "be afforded reasonable opportunity for private consultation with counsel."

<u>REQUEST FOR IMMEDIATE HEARING</u>

Defendant seeks an immediate hearing on this motion.

>Juan Ramos
>By his attorney,
>
>/s/ MELVIN NORRIS
>Melvin Norris
>  B.B.O. #373900
>260 Boston Post Road, Suite 9
>Wayland, MA 01778
>Tel: 508-358-3305

Date: February 14, 2005