UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )
v.    )    Criminal No.  04-10052-GAO
    )
    )
JUAN RAMOS    )

## OPPOSITION TO DEFENDANT'S MOTION TO PREVENT TRANSFER TO THE STATE PRISON AT CEDAR JUNCTION

The government is in receipt of the motion filed by Juan Ramos. Ramos claims that his transfer (along with all other federal detainees currently housed at Old Colony Correction Center ("OCC")) to a wing at the Massachusetts State Prison at Cedar Junction is somehow unlawful.[1] Without the benefit of any sworn factual averments pertaining to the specifics of his current confinement, Ramos is content to rely on general lore regarding alleged historical conditions at Cedar Junction and other state correctional facilities and to suggest that it somehow justifies judicial intervention in the management of this discrete group of detainees. Ramos therefore asks this court to do the very thing that the Supreme Court has said lower federal courts should not do--become too "enmeshed in the minutiae of prison operations." Bell v. Wolfish, 441 U.S. 520, 562

---

[1]  That wing will be devoted exclusively to federal prisoners in the custody of the United States Marshal either because they have been detained pending trial or like Martinez have been convicted and are awaiting sentencing and designation by the Bureau of Prisons.

(1979)("the inquiry of federal courts into prison management must
be limited to the issue of whether a particular system violates
any prohibition of the Constitution or, in the case of a federal
prison, a statute. The wide range of "judgment calls" that meet
constitutional and statutory requirements are confided to
officials outside of the Judicial Branch of Government.").[2]

Ramos' motion is unsupported from both a factual and legal
perspective.  Because Ramos has failed to show any substantial
claim or any basis on which further hearings should be held, his
motion should be summarily denied.  See United States v. Lewis,
40 F.3d 1325, 1331 (1st Cir. 1994) (evidentiary hearings are
required only when a defendant alleges facts that are
"sufficiently definite, specific, detailed, and nonconjectural,
to enable the court to conclude that a substantial claim is
presented").

One thing Ramos hasn't done is to come up with a legal
theory for his request (indeed, the defendant's motion to

---

[2]  See also Inmates of Occoquan v. Barry, 844 F.2d 828, 841
(D.C.Cir.1988) "in carrying out their remedial task, courts are
not to be in the business of running prisons. The cases make it
plain that questions of prison administration are to be left to
the discretion of prison administrators."); Taylor v. Freeman,
34 F.3d 266, 268 (4th Cir. 1994) ("It is well established that
absent the most extraordinary circumstances, federal courts are
not to immerse themselves in the management of state prisons or
substitute their judgment for that of the trained penological
authorities charged with the administration of such
facilities.").

transfer is devoid of a single citation for his demand that the court intrude on areas committed to the discretion of the Executive Branch).  The reason for this, of course, is that there is no such support on any of the available theories.  E.g., Hewitt v. Helms, 459 U.S. 468 (1983)("the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause"); Covino v. Vermont Dept. of Corrections, 933 F.2d 128 (2nd Cir. 1991)("the due process clause is not implicated when a pre-trial detainee is transferred from one facility to another"); Ryan v. Burlington County, 674 F.Supp. 464, 476 (D. New Jersey 1987)(citations omitted), affirmed and remanded, 860 F.2d 1199 (3rd Cir. 1988) ("it is beyond dispute that the Eighth Amendment does not apply to pretrial detainees").  See also Castaneda v. Henman, 914 F.2d 981, 983 (7th Cir.1990) ("It is well-settled that an inmate does not possess a constitutional liberty interest in remaining at a particular institution...."); Falcon v. Knowles, 807 F.Supp. 1531, 1533 (S.D.Fla.1992) (rejecting petition for emergency relief brought when defendant was moved out-of-state; court noted that there was no allegation that the transfer was intended to punish individual prisoner).[3]

---

[3]  Here, of course, all of the federal detainees formerly housed at OCC are being moved due to security at that institution and the difficulty in transporting prisoners to the Court. Fallon Aff. ¶¶2-3.  This eliminates any punitive claim. See also Bell v. Wolfish, 441 U.S. at 536 (recognizing that the government

To the extent that any legal theory can be gleaned from Ramos' motion, it fails as a matter of law.  For example, Ramos complains about the possibility that he could have incidental contact with sentenced prisoners "during moves, in the library, and in the Health Services Unit."  See Motion to Transfer at 4.[4] Even if this unproven allegation is true, it provides no basis for this Court to intervene.  Under 18 U.S.C. §3142(i)(2), a detainee like Ramos should be "committed to the custody of the Attorney General for confinement in a corrections facility separate, **to the extent practicable**, from persons awaiting or serving sentences or being held in custody pending appeal (emphasis added)."  As one court has noted, "'to the extent practicable' is generally understood to imply some degree of discretion."  Palay v. United States of America, 2000 WL 1368046 at 5 (N.D.Ill. 2000), affirmed in part, reversed in part, 349 F.3d 418 (7th Cir. 2003).  This provision "does not, however, prohibit or preclude pre-trial detainees from being held with convicted inmates" because it is a guideline, not a mandate. Falcon, 852 F.Supp. at 1417.

---

may detain individuals suspected of committing federal crimes "to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.").

[4] The materials attached to the Fallon affidavit show that such contact will be limited and controlled.  See Fallon Aff., Exhibit 3.

Moreover, the motion before the Court should also be denied because the judges of this Court have been advised of the Marshal's plan to transfer OCC prisoners and the Marshal has also consulted with and addressed the concerns of representatives of the defense bar. Attached as Exhibit 1 is an affidavit from Chief Deputy United States Marshall William Fallon filed in another casae making identical claims describing the events that led up to decision to move all federal detainees out of OCC and the efforts that have been made to apprize the Court and the defense bar of it. Because that affidavit, unlike the unsubstantiated and irrelevant matters set forth in the motion to transfer, shows that the Marshal has carefully planned this transfer to allay security issues and transportation-related complaints from the court and has listened to and addressed concerns raised by the defense bar, the motion to transfer is specious and should be denied.

## CONCLUSION

"A pre-trial detainee does not have the right to be housed at the facility of his choice, nor does he have a right to remain in the institution to which he was initially, or even at one time, assigned. The relevant question is not whether petitioner is a convicted inmate or a detainee; but whether the Attorney General has the discretion to determine where to detain... and, if so, whether her discretion is limited by mandatory language in

a statute or prohibited by regulation." Falcon, 852 F.Supp. at 1419.

The motion to transfer mocks these settled principles. Armed with a morass of speculative information that is irrelevant and totally unverified, Ramos attacks the management of the entire state prison system in the hopes that such an attack will somehow convince this Court to intercede to areas committed to the discretion of the Executive Branch.  It cannot and the motion should be summarily denied.

Respectfully submitted,

MICHAEL J.SULLIVAN
United States Attorney

By:  /s John A. Wortmann, Jr
JOHN A. WORTMANN,JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02210
(617)748-3207

Date: February 14, 2005

6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )
v.    )    Criminal No. 03-10323-NG
    )
ELLIS MARTINEZ    )

### AFFIDAVIT OF WILLIAM FALLON

I, William Fallon, being duly sworn, depose and state as follows:

1.  I am the Chief Deputy United States Marshal for the District of Massachusetts.  I am submitting this affidavit in response to the Emergency Motion of Ellis Martinez to Prevent Transfer.

2.  The United States Marshal is currently in the process of transferring all federal detainees formerly housed at the Old Colony Correctional Center in Bridgewater ("OCC") to two designated units at the Massachusetts State Prison at Cedar Junction ("Cedar Junction").  As of February 1, 2005, 28 detainees (including Ellis Martinez) have been transferred. Twenty-three federal detainees remain at OCC and will be transferred soon.

3.  The transfer is the result of longstanding problems at OCC that have been discussed with the judges of this district. The principal problems involve contraband being smuggled into OCC and transportation delays resulting from the location of the Department of Correction Transportation Unit (which is near Cedar

Junction).

4.  Several judges of the Court have complained to the Marshal about these problems.  The complaints include the December 6, 2004 letter attached as Exhibit 1.

5.  The transfer of these detainees from OCC to Cedar Junction was first discussed with members of the Court in a November 18, 2004 meeting of the Court Security Committee.  I recall that Judges O'Toole and Stearns were present.

6.  As discussions with the Massachusetts Department of Corrections regarding the possible transfer progressed, I also discussed the transfer with Chief Judge Young.  These discussions took place in a meeting on December 7, 2004.

7.  The transfer was originally scheduled to begin on January 10, 2005.  The preceding Friday (January 7, 2005) the Marshal's Office received complaints about the move from the Federal Defender's Office.

8.  The move was immediately postponed so that these concerns could be addressed.  A meeting took place with Federal Defenders Charles McGinty and Miriam Conrad at which time they were invited to tour the facility and air any concerns.

9.  Representatives of the defense bar (who I understand included Federal Defenders McGinty and Watkins and Charles Rankin, Esq.) thereafter toured the units at Cedar Junction that were proposed for the exclusive use of Federal Detainees.

2

10.   The Marshal thereafter received the letter attached as Exhibit 2.  The concerns expressed in that letter were discussed with the Massachusetts Department of Corrections and an email received addressing them was thereafter forwarded to Chief Judge Young.  The email is attached as Exhibit 3.

Signed under the pains and penalties of perjury this 1st day of February, 2005.

WILLIAM FALLON

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
JOHN JOSEPH MOAKLEY
UNITED STATES COURTHOUSE
1 COURTHOUSE WAY, SUITE 4130
BOSTON, MASSACHUSETTS 02210

NANCY GERTNER
DISTRICT JUDGE

December 6, 2004

**BY HAND**
Mr. Anthony Dicchio - U.S. Marshal
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston MA 02210

    Re:   <u>Old Colony Correctional Facility</u>

Dear Marshal Dicchio:

    I write to strongly object to the continued placement of federal prisoners in the above-referenced correctional facility. First, there is a severe problem with transportation. Ellis Martinez, the defendant over whose trial I am presiding, was one and one half hours late being brought to court this morning. The delay kept fourteen jurors, four lawyers, myself, and countless witnesses waiting (indeed, one of the witnesses was an expert who has to be out of the country on Wednesday; if his testimony is not finished the whole trial is at risk.) This has been a pattern during the past two weeks of trial. And, on the first day of trial, the transportation officials or the jail, lost the clothes that had been especially set aside for Mr. Martinez to wear to court. Indeed, this delay reminds me of the chaos I saw in the state system when prisoners would "arrive" hours after they were supposed to, or not at all. In my years on the bench, and before that as a lawyer appearing in federal court, I have never seen such a pattern.

Mr. Anthony Dicchio - U.S. Marshal
Page -2-
December 6, 2004


Second, I have heard reports of severe problems at the jail itself -- contraband, contact visits, drug paraphernalia, escape attempts, at least one report of staff having sex with an inmate, etc. Obviously, I do not know the truth of these later accusations, but from my vantage point -- the irresponsibility of the transportation officers -- I can only assume the worst.

I would like to meet with you immediately. This situation is intolerable.

Sincerely,

Nancy Gertner, U.S.D.C.J.

NG/gam

# EXHIBIT 2

FEDERAL DEFENDER OFFICE
DISTRICT OF MASSACHUSETTS
408 ATLANTIC AVENUE, 3RD FLOOR
BOSTON, MASSACHUSETTS 02110

TELEPHONE: 617-223-8061
(FAX) 617-223-8080

January 25, 2005

Hon. William G. Young
Chief United States District Judge
United States Courthouse
One Courthouse Way
Boston, MA 02210

Re: Proposed Transfer of Detainees to MCI Cedar Junction

Dear Chief Judge Young:

As representatives of the criminal defense bar, we write to bring to your attention our concerns regarding the Marshal's planned transfer of federal detainees to MCI Cedar Junction. We find unfathomable the plan to move federal detainees to the state's most infamous institution, particularly when detention space is available in county facilities. We ask to meet with you to detail our concerns, among them and most importantly, that the transfer will put our pretrial detainees, who are entrusted to the care of the Marshal while awaiting trial, at a substantial risk of physical harm.

The Marshal's plan, as we understand it, is to transfer to MCI Cedar Junction all 45 pretrial detainees now held in the state facility of Old Colony Correctional Center (OCC). The Marshal plans to add 45 more detainees, removing them from county facilities or taking them from new federal arrests. The 90 detainees will not be assigned to Cedar Junction by reason of past violence, nor will they be spared transfer if they have no record of violence.

When we learned about the planned transfer about two weeks ago, we sought a meeting with Marshal Dichio. He asked us to meet with Deputy Chief Marshal Bill Fallon, which we did. We also met with Judge Stearns to alert him, in his capacity as liaison to the Marshal's Office, to the move. Deputy Fallon helped arrange a walk-through of the Cedar Junction facility, and of the block where federal detainees would be held. We discussed conditions at Cedar Junction with representatives of Massachusetts Correctional Legal Services (MCLS), the state-wide legal services office for Massachusetts prisoners. We now bring our concerns to your attention.

Cedar Junction is a level six (maximum) institution. The only other maximum facility in the state is the Souza-Baranowski Correctional Center. A level 6 classification, according to the DOC's website. "reflect[s] the need to provide maximum external and internal control and

FEDERAL DEFENDER OFFICE

-2-

supervision of inmates primarily through the use of high security parameters and extensive use of internal physical barriers and check points. Inmates accorded this status present serious escape risks or pose serious threats to themselves, to other inmates, to staff, or the orderly running of the institution. Supervision of inmates is direct and constant." Thus, Cedar Junction houses a highly dangerous population. inmates who "pose serious threats to themselves, to other inmates, to staff, or the orderly running of the institution."

Cedar Junction's infamous reputation[1] arises only in part from the dangerousness of its inmate population. It also has a well-earned reputation for the harshness and brutality of its guards. Over the past four years, MCLS has maintained statistics regarding guard-on-inmate assaults at state and county institutions, as reported to MCLS. Attached to this letter is a bar graph summarizing calls to MCLS for the years 2000-2004. See Attachment A. Reports of guard violence originating from Cedar Junction are significantly greater than for any other institution. Indeed, reported guard violence at Cedar Junction is tenfold that at OCC.

MCLS also has a Rapid Response to Brutality Project, which, based on a human rights watch model, responds to claims of guard brutality by photographing injuries and advocating for medical care for injured prisoners. The project was created in November 2001 specifically in response to the extraordinary number of incidents of brutality reported from Cedar Junction. MCLS expanded the Project to MCI Framingham in 2003 and to Souza Baranowski in 2004. The number of reported incidents from both Framingham and Souza Baranowski has been low (less than 5 in the past 6 months). The number from Cedar Junction, however, has remained high. MCLS has logged over 120 visits to Cedar Junction over the past 3 years, with 6 visits in the past three weeks alone.

Additionally, between July 1997 and June 1999, the DOC reported that 4,764 disciplinary hearings were held at Cedar Junction. The DOC reported that none of the hearings resulted in a "not guilty" finding for the inmate. Each claim by guards was affirmed within the institution, suggesting that accusations made by guards against inmates were never seriously questioned.

It is hardly comforting to access the message board for Cedar Junction guards, MCICJ Officers Message Board, www.vov.com/12304. , which conveys the guards' hostility and contempt for the administration of the prison, their contempt for "rats" in their midst (presumably, fellow guards who report assaults and misconduct by guards), and their loathing for the inmates. The messages also reflect the commitment of the guards to maintaining their prerogative and control over guard assignments within Cedar Junction.

As it turns out. the superintendent at Cedar Junction has little control over guards and their assignments within the institution. and is unable to remove abusive guards without arbitration proceedings. In the recently-released Report of the Governor's Commission on

---

[1]The institution has the "character of infamy." See Brown v. Commissioner of Correction, 394 Mass. 89. 94 (1985).

FEDERAL DEFENDER OFFICE

-3-

Corrections Reform,[2] issued on June 30, 2004, the Governor's Commission leveled criticism at the DOC for inadequate control over its facilities, finding that "[t]he Department's management does not have sufficient authority and discretion" to control work assignments within its institutions. Under the collective bargaining contract with correction officers, management had "severely limit[ed]" authority "to assign, promote, transfer and remove a correction officer for the good of the Department." Commission Report at 14. In three facilities, including Cedar Junction, guards "bid" (or "job pick") for their unit assignments "which means that officers can bid for the job they want, and jobs are awarded on the basis of seniority." Id. In Cedar Junction alone, guards have the power to "bid" a particular shift and a particular cell block, and then hold it "for life." Id. at 14, n. 47. The report found that "locked-in bids and seniority govern the staffing process, subject only to a small number of superintendent pick positions." Id. at 14. The practical effect, particularly in Cedar Junction, is that the superintendent is

> unable to transfer or remove an officer for the good of the Department without being subject to grievance and arbitration. *These limitations on managerial discretion impact the most fundamental management functions required to effectively staff and operate DOC facilities.*

Id. at 14-15 [emphasis in original]. In particular, the report "found that the corrections officers were not in jobs that best matched their level of training and strengths or their compatibility with a specific population." Id. at 15. This specific criticism, that DOC has not the means to tailor its guard staff to the "specific population", or, more bluntly, to weed out abusive guards from choice work assignments, is fundamental here. After all, what guard with seniority wants to work Block 10 or the disciplinary unit when a softer population awaits in the proposed federal unit?

Concerned, we asked the Cedar Junction Superintendent, David Nolan, how the detainee blocks would be staffed, and he told us that the collective bargaining agreement with the guards would dictate staffing on the unit. We asked whether guards would receive any special training on how to handle detainees (as opposed to how they might handle a level six inmate) and he said no.

As this Court is aware, many of the detainees in this District are held solely on the ground of flight or non-appearance. Some are charged with immigration-related offenses and are held primarily to assure eventual deportation. Others face possible immigration consequences arising from a conviction. Some were initially released, but later revoked, for minor infractions of release conditions, including personal drug use.

Once detained, detainees in this district are not classified or evaluated by the marshal to separate them from persons held by reason of their violent record. (Detainees are separated from known enemies or if cooperating.) Thus, detainees with no records of violence are grouped with

---

[2]The Governor's Commission was created in the aftermath of the high profile death of John Geoghan and the ensuing scandal. A copy of the Report is attached at Attachment B.

FEDERAL DEFENDER OFFICE

-4-

those who have. If the Marshal's transfer proceeds, all will be detained together in an institution that has insufficient control over its guards and staffing, and where guards are not in jobs "that best matched their level of training and strengths or their compatibility with a specific population." Thus, senior guards, notwithstanding their disciplinary problems or reputations for violence or cruelty, can "bid" to handle the relatively soft population offered by the feds within the planned detainee unit. Plainly, trouble will follow.

On Wednesday, January 19, we were taken on a tour of the facility and of the proposed federal units, blocks 4 and 8. These blocks, along with other blocks which hold sentenced prisoners, are spaced sequentially along a long corridor. Detainees will have contact with sentenced prisoners during moves, in the library and in the Health Services Unit. They will be mixed in general population for religious services. A detainee who is disciplined is likely to be held, during an investigation which often takes several months, in the infamous Block 10, which is a sentenced prisoner block, and he may face an internal sentence to the equally notorious DDU. (As this Court is aware, prison fights generally result in all participants being disciplined, even the ones assaulted. All would be moved to Block 10.)

The ostensible justification for transfer (although hardly explaining why county detainees would be moved) is that OCC has "contraband problems" arising from contact visits. All DOC facilities, save Cedar Junction and Baranowski, have contact visits, and each (including MCI Concord, Framingham and Norfolk) manages to maintain security. We have not been given any details about the scope or frequency of the "contraband problem" at OCC, including whether it is limited to the federal detainees or their visitors, and thus cannot assess the proffered reason. It would seem that the solution to OCC's contraband problem lies within its security measures, not in a wholesale relocation of the federal portion of the population to a max.

The Marshal also maintains that he cannot house federal detainees in contact institutions. But Framingham is a contact institution and female detainees at Framingham continue to have contact visits. We took a national survey, relying on reports from Federal Defenders and CJA counsel around the country, asking if they have contact institutions within their district. We attach to this letter a summary of their replies, that there are numerous facilities around the country which permit contact visits, among them federal detention facilities in Michigan, Texas, Hawaii and Florida. See Attachment C.

In any event, there are beds available at county facilities. Plymouth County House of Correction is currently operating below capacity, and could absorb all 45 of the OCC detainees. Indeed, it is perfectly plain that this proposed transfer is hardly driven by a shortage of county beds; after all, the Marshal plans to reduce the county population by 45 persons.

So why, we ask, is the Marshal proposing the move to Cedar Junction? It surely cannot

FEDERAL DEFENDER OFFICE

-5-

be that the state has overbuilt its maximum capacity,[5] and that the feds are obligingly renting it.
But what other earthly reason can there be? There is little sense, and considerable danger, in
moving detainees to a "max", where contact with sentenced prisoners is inevitable; where
lockdowns are a commonplace (a single "incident" on Block 10 will cause the entire institution
to "go into lockdown," disrupting recreation time, visits, and so forth); where attorneys will be
barred from the institution during lockdowns; where attorneys are barred during the yearly
"shakedown" (held at an undisclosed time) which closes Cedar Junction for two days or more
while it is searched top to bottom; and where the guards are the hardened staff of a maximum
institution who will treat detainees the only way they know how. As defense counsel, how do we
explain to a detainee held on an immigration case that his custody may be within an institution
notorious for hardship and violence, and not only from the inmates? How can we not ask each
magistrate-judge who detains a client for an order prohibiting his detention at Cedar Junction?

It is the appropriate business of this Court to ensure the safety of persons ordered detained
pending trial. This proposed transfer of a significant part of the federal detainee population to an
institution which has a well-earned reputation for brutal conditions cannot be undertaken without
due consideration of the safety of detainees. We respectfully ask for a meeting with you to
address these concerns.

Respectfully,

Charles P. McGinty
Charles P. McGinty
Peter B. Krupp by CWS
Peter B. Krupp
CJA Panel Representative
Charles W. Rankin by CWS
Charles W. Rankin
Chairman, CJA Board

cc: Hon. Richard G. Stearns
    Anthony Dichio, United States Marshal

---

[5]One of the many criticisms in the Commission's Report is that the DOC holds too many
inmates in maximum facilities for too long a time. ("[N]ot enough prisoners are 'stepped down'
to lower security levels prior to release." Commission Report at 35.) Perhaps this explains some
of Cedar Junction's excess capacity.

# EXHIBIT 3

## Dichio, Anthony (USMS)

**From:**     James.R.Bender@state.ma.us
**Sent:**     Wednesday, January 26, 2005 2:35 PM
**To:**       Dichio, Anthony (USMS)
**Subject:**  Federal Detainees at MCI-Cedar Junction

In response to your recent phone conversation concerning the conditions of confinement for your federal detainees at MCI-Cedar Junction (MCI-CJ) please be advised of the following:

1.   Two units have been set aside to house these detainees.  These units are Block 4 and 8 in the East Wing of the facility.  These are 45 man cells.  All detainees will be single bunked.

2.   The detainees will eat in the chow hall seperately from general populations inmates at MCI-CJ. They will either eat before the general population blocks are called or directly afterwards.  These meal periods will be staggered from day to day. As I mentioned there may be inmate runners/cleaners out during this time but very few and controlled.

3.   They will recreate in the main yard and the gymnasium separate from  general population inmates at MCI-CJ.  The main yard is divided in two by fencing and as a result there may be general population inmates recreating in the other half of the yard at the same time.

4.  If they go to the law library and religious services they would be mingling with general population inmates.  We limit the number of inmates in the law library to approximately 25.  It should be noted, however, that Block 4 and 8 will have a cell set up as a satellite law library so they do not need to leave their unit if they don't want to.

5.  There will be incidental contact with general population inmates in the Health Services Unit if they need to go there.  We have two holding cells in this area that could have general population inmates in need of medical services.

6.  Currently there are two phones in each of these units.  I have instructed the facility to add two more phones to each unit for a total of 8.  If we find that we need to expand on this we can do so.

7.  As you know the detainees will have access to attorney visits 7 days a week in the contact visiting rooms located in the visiting room lobby.  Currently we have three of these rooms.  We will monitor and if we need to expand we will do so.

8.  You were right that staff are allowed to pick their job assignments at MCI-CJ as well as their shift and days off.  We do monitor their behavior and feel we have a good control over staff/inmate interactions.  If you ever encounter any issues please let me know.

I wanted to explain something to you that might ease some concerns. MCI-CJ is our most structured facility.  We limit the amount of  out of cell time for our general population inmates.  All movement outside their cells is controlled.  There are limited out of block programming for them and much of their activity is confined to their own cell block.  They will have out of cell tier time but will not be able to go out in the main corridor.  The same holds true with the federal detainees in that they will not be mingling with the general population inmates except in those occassions when they choose to go to religious services or the law library.  There was much more opportunity for them to mingle with general population inmates at OCCC then there will be at MCI-CJ.

The institution also conducts non-contact visits which limits the amount of contraband that enters the facility.  At times we have homebrew issues which inmates make with bread and raisins etc. etc.   We are constantly monitoring and searching rooms to control this.  When you see a facility with homebrew you know that the drugs are not too prevalent.  I think this is due to the security that is in place.

We will continue to monitor the situation and improve operations as we go along.   Please advise when we will be moving the detainess to MCI-CJ.  Any questions please call me.   My cell phone is 508-326-7689.  Thanks.
Jim